LORI RIFKIN – 244081
RIFKIN LAW OFFICE
P.O Box 19169
Oakland, California 94169
Telephone:    (415) 685-3591
Facsimile:     (510) 255-6266
Email: lrifkin@rifkinlawoffice.com

Attorney for Plaintiff

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Estate of Dimitris Kalatzakis, deceased, by and through Miltiadis Kalatzakis, D.K., a minor, by and through his guardian ad litem, Miltiadis Kalatzakis, Takis Kalatzakis, and Sandra Kalatzakis, <br><br> Plaintiffs, <br><br> v. <br><br> R.T.C. Grounds, N. Walker, J. Guglielmo, R. Romero, Connie Gipson, Gary Sandor, A. Peterson, Sgt. D. Tepperman, G. Mascarenas, J. Bugarin, J. Watkins, M. Oliveira, and Does I-X, in their individual capacities, <br><br> Defendants. | Case No. <br><br> **COMPLAINT** <br><br> <u>JURY TRIAL DEMANDED</u> <br><br> 1. Failure to Protect from Harm and Provide Health Care in Violation of Eighth and Fourteenth Amendments & 42 U.S.C. § 1983; <br> 2. Deprivation of Substantive Due Process in Violation of First and Fourteenth Amendments & 42 U.S.C. § 1983; <br> 3. Negligent Supervision, Training, Hiring, and Retention; <br> 4. Negligence; <br> 5. Wrongful Death. |

# INTRODUCTION

1.     On October 4, 2013, Dimitris Kalatzakis was brutally attacked and killed by his cellmate, Brandon Keen, at Salinas Valley State Prison in Soledad, California. Mr. Keen was serving a 25-year prison term for his attack on another inmate, and had a known history of engaging in serious violence and gang activity within jail and prison settings. Although Mr. Kalatzakis had been diagnosed with serious mental illness by the California Department of Corrections and Rehabilitation ("CDCR"); had a low IQ, documented learning disabilities, and had been deemed "borderline intellectual functioning" by CDCR clinicians; and had a mental health history that further suggested vulnerability, prison officials nonetheless assigned Mr. Keen as his cellmate.

2.     This is an action for damages against California Department of Corrections and Rehabilitation ("CDCR") officials, supervisors, and officers for their failure to protect a vulnerable man entrusted to their care, despite known and obvious risks.

# JURISDICTION

3.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 in that this case arises under federal law and seeks damages for the violation of civil rights, privileges, and immunities secured by the First, Eighth, and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. § 1983.

4.     This Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367(a) because Plaintiffs' state law claims form part of the same case or controversy under Article III of the United States Constitution.  Plaintiffs state law claims shares all common operative facts with their federal law claims, and the parties are identical.  Resolving all state and federal claims in a single action serves the interests of judicial economy, convenience, and fairness to the parties.

# VENUE

5.     Plaintiffs' claims, alleged herein, arose in the County of Monterey, California. Venue therefore lies in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(2).

6.     Rule 3 of the Federal Rules of Civil Procedure and Local Rule 3-2(e) authorizes assignment to this division because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the counties served by this division.

## EXHUASTION OF PRE-LAWSUIT PROCEDURES FOR STATE LAW CLAIMS

7.     Plaintiffs filed notice of governmental tort claims with the California Victim Compensation & Government Claims Board on behalf of Plaintiffs Estate of Dimitris Kalatzakis, D.K., Takis Kalatzakis, and Sandra Kalatzakis on March 28, 2014.  By correspondence dated July 27, 2014, the Board rejected the governmental tort claims.

## PARTIES

8.     Plaintiff D.K. is the thirteen year-old minor son and sole heir of Dimitris Kalatzakis.  Plaintiff D.K. brings his individual claims by and through Miltiadis Kalatzakis, his uncle and guardian ad litem[1].  D.K. resides in Contra Costa County and Miltiadis Kalatzakis resides in Alameda County.

9.     Plaintiff D.K. also brings claims on behalf of the Estate of Dimitris Kalatzakis, by and through his guardian ad litem, Miltiadis Kalatzakis, pursuant to California Code of Civil Procedure §§ 377.10 *et seq*. At the time of his death, Dimitris Kalatzakis was a 31 year-old citizen of the United States and was incarcerated in Salinas Valley State Prison ("SVSP"), located in the County of Monterey in the State of California.  The survival causes of action in this matter are based on violations of Dimitris Kalatzakis's rights under the U.S. Constitution and California state law.

10.     Plaintiff Takis Kalatzakis is the father of Dimitris Kalatzakis and resides in Santa Clara County, California.  He is suing individually for violations of civil rights under the First and Fourteenth Amendments of the U.S. Constitution and California state law.

11.     Plaintiff Sandra Kalatzakis is the mother of Dimitris Kalatzakis and resides in San Joaquin County, California.  She is suing individually for violations of civil rights

---

[1] An application for appointment of guardian ad litem is filed concurrently with this Complaint.

under the First and Fourteenth Amendments of the U.S. Constitution and California state law.

12.     Defendant R.T.C. Grounds was at all times relevant to the actions and omissions described herein employed as Warden at SVSP and legally responsible for oversight of operations at SVSP, including classification and security operations; implementation of CDCR policy and procedures; staff training, assignment, and supervision; safety and security of inmates housed at SVSP; and the supervisor of all other individual Defendants employed at SVSP.  Defendant Grounds is sued in his individual capacity.

13.     Defendants N. Walker, J. Guglielmo, and R. Romero were at all times relevant to the actions and omissions described herein employed as officers at SVSP, and comprised the SVSP Facility C Unit Classification Committee that met on June 21, 2013 and assigned Dimitris Kalatzakis to double-celled housing in the general population Facility C Unit at SVSP.  Defendants Walker, Guglielmo, and Romero are sued in their individual capacities.

14.     Defendant Connie Gipson was Warden at California State Prison-Corcoran ("CSP-Corcoran") was at all times relevant to the actions and omissions described herein employed as Warden at CSP-Corcoran and legally responsible for oversight of operations at CSP-Corcoran, including classification and security operations; implementation of CDCR policy and procedures; staff training, assignment, and supervision; safety and security of inmates housed at CSP-Corcoran; and the supervisor of all other individual Defendants employed at CSP-Corcoran.  Defendant Gipson is sued in her individual capacity.

15.     Defendants Gary Sandor, A. Peterson, Sgt. D. Tepperman, G. Mascarenas, J. Bugarin, J. Watkins, and M. Oliveira were at all times relevant to the actions and omissions described herein employed as officers at CSP-Corcoran, and comprised the CSP-Corcoran Security Housing Unit Inmate Classification Committees that met in December 2012 and February 2013 and determined Dimitris Kalatzakis's housing

classification.  Defendants Sandor, Peterson, Tepperman, Mascarenas, Bugarin, Watkins, and Oliveira are sued in their individual capacities.

16.    The true names and identities of Defendants DOES I through X are presently unknown to Plaintiffs.  Plaintiffs allege that Defendants DOES I through X were employed by CDCR at CSP-Corcoran or SVSP at the time relevant to the actions and omissions described herein. Plaintiffs allege that each of Defendants DOES I through X was deliberately indifferent to Dimitris Kalatzakis's health and safety, failed to appropriately assess and make housing classification and assignments for Dimitris Kalatzakis and Brandon Keen, violated Dimitris Kalatzakis's civil rights, wrongfully caused his death, and/or encouraged, directed, enabled and/or ordered other Defendants to engage in such conduct.  Plaintiffs further allege that Defendants DOES I through X violated Plaintiffs' First and Fourteenth Amendment rights, and rights under California state law.  Plaintiffs further allege that each of Defendants DOES I through X was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of CDCR employees and/or agents involved in the conduct alleged herein.

17.    At all times relevant to the allegations herein, each Defendant was acting in the course and scope of his or her employment and under color of state law.

## FACTUAL ALLEGATIONS

The Death of Dimitris Kalatzakis on October 4, 2013

18.    On the morning of October 4, 2013, Mr. Kalatzakis underwent dental surgery for a tooth extraction.

19.    On information and belief, Mr. Kalatzakis was administered sedatives in connection with the tooth extraction on October 4, 2013.

20.    According to CDCR records, Mr. Kalatzakis was escorted to the dental clinic at 9:00 a.m. and left the dental clinic at 9:40 a.m., when he was transported back to his cell in Facility C, a general population unit at SVSP.

21.    According to the portion of the CDCR Inmate Death Report released to the family, Mr. Kalatzakis was found unresponsive in his cell at an unspecified time, a "man

down" alarm was sounded at 11:02 a.m., medical staff arrived at 11:05 a.m., and Mr. Kalatzakis was pronounced dead in his cell at 11:10 a.m.

22.     According to the Monterey County Coroner's Report, the cause of death was "blunt force trauma with strangulation" as a result of Mr. Kalatzakis's cellmate, Brandon Keen, assaulting him.  The Coroner's Report ruled Mr. Kalatzakis's death a homicide and detailed the extensive physical injuries that Mr. Keen had inflicted on Mr. Kalatzakis, including ligature marks on his neck, trauma to the entire left side of his face, scalp, and ear resulting in fractures and hemorrhaging, five stab wounds on his neck and back, blunt force injury to his chest, additional abrasions on his neck and back, and contusions on his wrist and leg.

23.     The Coroner's Report notes that there was a large pool of blood on the floor of the cell and additional blood spatter on the walls, door, and floor of the cell.

24.     On information and belief, there were no offensive injuries on Mr. Kalatzakis's body, indicating that he had not engaged in mutual combat with Mr. Keen.

25.     Mr. Kalatzakis's injuries were so extensive that the director of the funeral home where his body was prepared advised his family to the effect of "I don't think you want to see this."

26.     Those members of Mr. Kalatzakis's family who did observe his body in the casket saw that the skin of his face was black from strangulation, and his face had been smashed and brutalized.

Dimitris Kalatzakis Had Vulnerabilities Known to CDCR

27.     Dimitris Kalatzakis had a history of serious mental illness and learning disabilities that was known to CDCR.  He had been diagnosed as having bipolar disorder, schizophrenia, and depression, and was identified by CDCR as needing mental health treatment for a serious mental disorder and included in CDCR's Mental Health Services Delivery System.

28.     Mr. Kalatzakis was classified at the "Correctional Clinical Case Management System" level of care in CDCR's mental health system.  However, in late 2012, Mr.

Kalatzakis's primary CDCR mental health clinician suggested that Mr. Kalatzakis should have been receiving a higher level of mental health treatment and was being undertreated,

29. Mr. Kalatzakis also had a known history of psychiatric hospitalizations in Santa Clara County, where he had lived with his parents prior to his incarceration.

30. Mr. Kalatzakis was first documented to have learning disabilities in elementary school, and he attended special education classes throughout his schooling. Records in his CDCR file note that he had a low IQ and "Borderline Intellectual functioning."

31. Mr. Kalatzakis also had a history of concern about having a cellmate that was known to CDCR. A January 18, 2012 note in his custody classification file states "I/m [inmate] disagree [sic] w/ DC [double cell] status."

32. Between March 2012 and his death, Mr. Kalatzakis received four disciplinary rules violations for "Willfully Delaying a Peace Officer (Refusing to Accept Assigned Housing)" for refusing a cellmate.

33. In November 2012, as part of the disciplinary process connected with one of his refusals to accept a cellmate, Mr. Kalatzakis received a mental health assessment from his psychologist at CSP-Corcoran that stated, "There is sufficient evidence that suggests he [Mr. Kalatzakis] may have a severe mental illness that is being undertreated at this time" and "COs in the building say he's paranoid. He has magazine pictures covering his cell walls and never leaves his cell. He is not very cooperative with mental health and he may not be getting the proper medications that he needs. We are also uncovering evidence in the C-file of low IQ." The clinician concluded that mental health factors were present that would cause Mr. Kalatzakis to experience difficulty in understanding the disciplinary process and suggested that penalties for the disciplinary violation be decreased.

34. The clinician also noted that clinical staff had "been missing a lot of information on this inmate which is in the C-file" and "[t]here appears to be much more going on with this inmates [sic] mental status than meets the eye."

35. On information and belief, Mr. Kalatzakis was not provided with any follow-

up evaluation for a higher level of mental health treatment, despite the clinician's recommendation, nor was Mr. Kalatzakis actually provided with increased mental health care.

36.    On or around December 10, 2012, Mr. Kalatzakis was charged with another rules violation for refusing a cellmate.

37.    Despite the documents in Mr. Kalatzakis's file described above, the Inmate Classification Committee ("ICC") at CSP-Corcoran did not adjust his classification assessment to reflect more serious mental illness or intellectual disabilities.

38.    On December 19, 2013, the ICC elected to continue Mr. Kalatzakis on double cell status.  The ICC summary for that date also reflects that the placement of Mr. Kalatzakis "in alternative Levels of Care in the Mental Health Services Delivery System was considered and is not recommended.  Per clinician, [subject's] mental health is unlikely to decompensate while retained in Ad Seg/SHU."

39.    The ICC at CSP-Corcoran met again on February 3, 2013 and again did not adjust Mr. Kalatzakis's classification assessment to reflect more serious mental illness or intellectual disabilities, and again continued double cell status.  According to the ICC Summary for that date, the ICC erroneously "noted that the clinicians stated that [subject's] Mental disorder did not appear to contribute to the behavior relative to RVR dated 11/7/12 & 12/10/12."  The clinician's assessment related to the November 7, 2012 RVR in fact concluded that Mr. Kalatzakis's mental illness did appear to contribute to the behavior that led to the RVR.

40.    Mr. Kalatzakis was transferred to SVSP from CSP-Corcoran on June 10, 2013.  He had an estimated release date of October 15, 2015.

41.    After the transfer of Mr. Kalatzakis to SVSP on June 10, 2013, the SVSP Facility C Unit Classification Committee ("UCC") met to conduct an initial review of his housing classification assignment on June 18, 2013.

42.    On information and belief, during its review on June 18, 2013 the UCC at SVSP failed to appropriately consider Mr. Kalatzakis's psychiatric and intellectual

disabilities and failed to assign him a housing classification that appropriately reflected those serious vulnerabilities.

43.     Although the UCC noted that Mr. Kalatzakis had a history of refusing cellmates, on information and belief, the UCC failed to appropriately consider or investigate whether this history of refusal, especially when combined with his documented disabilities, indicated legitimate safety concerns on the part of Mr. Kalatzakis.

44.     The SVSP UCC assigned Mr. Kalatzakis to General Population housing and cleared him for double-celling.  Mr. Kalatzakis was then double-celled in the Facility C unit.

45.     In or around July 2013, Mr. Kalatzakis's mother, Plaintiff Sandra Kalatzakis, called the health care services division of CDCR because she was concerned about her son's safety and concerned that he was not receiving appropriate mental health treatment.

46.     After Ms. Kalatzakis left two detailed messages with health services, a staff member called her back and told Ms. Kalatzakis they could not speak with her about her son until he signed a release authorizing them to share his medical information.

47.     Mr. Kalatzakis's parents then mailed him the medial release to sign, but Mr. Kalatzakis told them he never received it, and that he was not provided a release form when he requested one from staff.

48.     In or around the beginning of September 2013, Mr. Kalatzakis was assigned a new cellmate, Brandon Keen.

49.     Mr. Keen was serving a 25-year term for mayhem related to his 2012 attack on a fellow inmate at Riverside County Jail.  He was convicted of attacking another inmate with a razor blade and slashing him on his face and ears.

50.     On information and belief, Mr. Keen was known to CDCR to participate in gang-related activity, and identified as a "skinhead."

51.     Mr. Kalatzakis was determined to avoid being involved with gangs and gang-related activity while he was in prison.  He was known not to engage in gang activity and would often refuse to come out of his cell so that he could avoid the gang-related

culture that dominates the state prisons in California.

CDCR Policies and Practices at SVSP Were Inadequate to Protect Dimitris Kalatzakis from Harm Given the Known Dangerousness of Conditions at SVSP

52. In 2000, CDCR discontinued the requirement that non-reception center CDCR prisons complete a General Population Double Cell Review (CDCR Form 1882-A). According to the California Office of the Inspector General, CDCR eliminated this requirement because of its policy that all inmates be double-celled unless specifically prohibited. (OIG Semi-Annual Report Jan-June 2014 Vol. II at 5.)

53. On information and belief, CDCR's policy that all inmates double cell was the result of severe overcrowding rather than an evidence-based policy determination that all inmates could safely double cell.

54. The OIG recommended in its Jan-June 2014 Semi-Annual Report that "[i]nmates with prior violence toward cellmates should not be double celled, even in SNY, until an inmate's propensity for violence is considered." (OIG Semi-Annual Report Jan-June 2014 Vol. II at 5.)

55. In December 2011, an Expert Panel convened by CDCR found that CDCR should not use its current Custody Designation system as a proxy for risk of inmate misconduct, concluding, "The custody classification system was not designed for this purpose and does not capture meaningful dimensions of an inmate's likelihood of bad behavior." (Expert Panel Study of the Inmate Classification Score System, CDCR, December 2011.)

56. SVSP is an extremely overcrowded prison. On September 29, 2013, CDCR reported a population of 3,522 inmates at SVSP. CDCR reported that SVSP was at 143.6% of design capacity, meaning that it was housing almost 1,100 more inmates that CDCR had previously determined could be safely housed at the prison.

57. SVSP is also severely understaffed in terms of uniformed custody staff. In September 2013, CDCR reported that it had almost one hundred budgeted uniformed custody staff positions unfilled, leaving SVSP with an approximately 9.7% custody

vacancy rate. Custody staff were required to work 21,402 hours of overtime, or an average of 24.35 hours of overtime per custody staff member.

58. Overcrowding and understaffing is known to dangerously undermine the safety and security of inmates housed in a prison, as detailed, for example, in the Prison Overcrowding State of Emergency Proclamation made by Governor Schwarzenegger on October 4, 2006.

59. SVSP has a known and serious history of violence by inmates against other inmates and staff, and has earned a reputation as one of the most dangerous prisons in California.

60. Further, Facility C in SVSP, where Dimitris Kalatzakis was housed, has a reputation for being one of the most violent units at SVSP. For example, in 2007, National Geographic highlighted Facility C at SVSP in its television show "Lockdown" as a yard on which there is massive gang activity, and gang leaders coordinate assaults, riots, and murders.

61. In October 2013, there were at least two inmate-on-inmate homicides reported by CDCR at SVSP including the murder of Mr. Kalatzakis.

62. Based on the reported population of 3,522 inmates at SVSP, the rate of inmate-on-inmate homicides in October 2013 at SVSP was 57 homicides per 100,000 inmates, which is approximately 8 times the national average of 7 homicides per 100,000 state prison inmates, according to the most recent data (2012) published by the U.S. Bureau of Justice Statistics.

63. The rate of inmate-on-inmate homicides at SVSP for August-December 2013 was the highest of any of CDCR's Level IV (maximum security) prisons, as reported by CDCR in its statistical report for that time period. The only other Level IV prison reporting any inmate homicides during that time period was CSP-Corcoran, and its rate was 23 homicides per 100,000 inmates. The rate at SVSP was more than twice this rate.

64. In October 2014, almost exactly one year after Dimitris Kalatzakis's murder, another cellmate inmate-on-inmate homicide was reported to have occurred in SVSP when

one inmate serving a life sentence for attempted murder repeatedly stabbed his cellmate in the cell, causing his death.

65.     CDCR policies and practices concerning the general population units at SVSP do not adequately assess inmates' dangerousness and vulnerability for double-celling, and do not adequately protect inmates from foreseeable harm.

66.     On information and belief, CDCR policies and practices concerning the staffing and supervision and training of staff on Facility C at SVSP are inadequate to protect inmates from harm.

Defendants' Failure to Protect Mr. Kalatzakis From Harm Has Resulted in Grievous Loss

67.     Despite his disabilities, prior to his incarceration in 2008, Mr. Kalatzakis had successfully run his own pressure-washing business for approximately two years. He worked hard and completed jobs his competitors saw as too difficult. He was actively planning to re-start his business when he was released in 2015, and, while incarcerated, was working his way through educational materials on financing, business establishment, and pressure-washing.

68.     Mr. Kalatzakis had a close relationship with his family. They describe him as tender-hearted and sensitive person who would go out of his way to help those around him.

69.     While Mr. Kalatzakis was in prison, his parents visited him every week or every other week, despite the hours-long drive visiting required.

70.     In fact, Mr. Kalatzakis's parents used CDCR's scheduling system on Sunday, October 6, 2013—two days after his death—to schedule a visit with their son, and received a confirmation for this visit. They learned of Mr. Kalatzakis's death only on Monday, October 7, 2013 when Mr. Kalatzakis's father, Plaintiff Takis Kalatzakis, received a telegram left on his doorstep. The telegram read "I regret to inform you of the death of your son Dimitris Kalatzakis on Oct. 4, 2013."

71.     At the funeral for Mr. Kalatzakis, his then-twelve year-old son, D.K., expressed his sadness about the death of his father, his love for him, and his

1  disappointment that he would not have the chance to continue to deepen his relationship

2  with him.

3      72.     At the time of Mr. Kalatzakis's death, D.K. and his family had been in the

4  process of completing the paperwork necessary for him, as a minor, to visit Mr. Kalatzakis

5  at SVSP.

6      73.     Even after they separated, Mr. Kalatzakis and D.K.'s mother kept in close

7  touch, and D.K. was included as an active part of Mr. Kalatzakis's family.

8      74.     Mr. Kalatzakis's family members have been deeply impacted by his

9  untimely death, the circumstances thereof, and the refusal of Defendants and other

10  government actors to provide them with any information regarding Mr. Kalatzakis's death.

11      75.     Plaintiffs Takis and Sandra Kalatzakis, Mr. Kalatzakis's parents, continue to

12  experience emotional distress as a result of Mr. Kalatzakis's death, the manner of his

13  death, and the loss of their relationship with their son.

14      76.     In addition to the emotional distress experienced by Plaintiff D.K. as a result

15  of Mr. Kalatzakis's death, D.K. lost both the future emotional and financial support of his

16  father.

17  The Refusal of Government Entities to Provide Information About Mr. Kalatzakis's Death

18      77.     After they learned of Mr. Kalatzakis's murder, his family exhaustively tried

19  to obtain more information about the circumstances of his death.

20      78.     Despite the obvious horror of the attack on Mr. Kalatzakis, every

21  government entity with responsibility for investigating his death has steadfastly refused to

22  provide any information to his family.

23      79.     Between October 2013 and February 2014, Mr. Kalatzakis's father, Plaintiff

24  Takis Kalatzakis, repeatedly contacted the Monterey County District Attorney's office to

25  request information about his son's death and the related criminal investigation.  He was

26  told the investigation was "ongoing" and denied access to any information or documents.

27  His request to speak to the investigator on the case was also denied.

28      80.     After the family retained counsel in February 2014, Plaintiffs' counsel also

contacted the Monterey County District Attorney's office on multiple occasions to request information about the death of Mr. Kalatzakis and any related investigations and criminal proceedings, including access to any CDCR and Monterey County Sheriff's Office incident reports and investigations, the coroner's report, and information regarding the criminal prosecution of Mr. Keen. The Monterey County District Attorney's office denied Plaintiffs all access to information and informed counsel that no charges had been filed and the investigation was ongoing. Finally, in late June 2014, pursuant to counsel's repeated requests, the District Attorney's office permitted Plaintiffs to receive the coroner's report for Mr. Kalatzakis.

81. To date, on information and belief, the Monterey County District Attorney has not filed any charges against Mr. Keen related to this incident.

82. The Monterey County District Attorney's office has informed Plaintiffs' counsel that their investigation is "ongoing," and, therefore, no additional information will be provided to Mr. Kalatzakis's family regarding his death and any investigation thereof.

83. Following Mr. Kalatzakis's death, his family also contacted CDCR to request Mr. Kalatzakis's medical and custody records. Although CDCR produced these records, on information and belief, CDCR did not produce the full incident report related to Mr. Kalatzakis's death, and did not produce any records pertaining to any investigation of this death or Mr. Keen. Plaintiffs' counsel requested this information from CDCR on behalf of the victim and his family, but was denied access to this information.

84. On June 25, 2014, on behalf of Mr. Kalatzakis's family, Plaintiffs' counsel submitted a request for information related to the death of Mr. Kalatzakis to the California Office of the Inspector General ("OIG") pursuant to the California Public Records Act, Cal. Gov't Code §§ 6250 et seq. The OIG is charged with monitoring and providing oversight of "critical incidents" that occur in the CDCR institutions, including any deaths.

85. On July 11, 2014 the OIG denied the family's request for information, asserting that it was barred from producing such information and stated that Mr. Kalatzakis's death would most likely be included among the critical incidents reviewed in

the OIG's next Semi-Annual Report, to be released in September 2014.

86. On August 26, 2014, the family submitted a modified PRA request, requesting any records pertaining to inmate-on-inmate homicides at SVSP from 2010 through the present.

87. On September 4, 2014, the OIG denied the modified request, and again stated that Mr. Kalatzakis's death would most likely be included in the OIG's next Semi-Annual Report, to be released in September 2014.

88. When the OIG's next Semi-Annual Report was released in October 2014, it did not include any information or review of Mr. Kalatzakis's death, despite the Report's coverage of incidents from winter 2013 through spring 2014.

89. When Plaintiffs' counsel contacted OIG to inquire about this omission, General Counsel for OIG informed Plaintiffs' counsel that there had been a "goof." OIG confirmed that the review of Mr. Kalatzakis's death had been completed by OIG and should have been included in the Report, but there had been a "goof." OIG refused to produce any information related to Mr. Kalatzakis's death and instructed counsel that such information would be included in the OIG's next report in spring 2015. OIG maintained its refusal despite being informed that the statute of limitations for Plaintiffs' tort claims would expire in December 2014.

90. As a result of the withholding of information by all government agencies charged with oversight for investigating Dimitris Kalatzakis's death, Plaintiffs are currently unable to specifically identify Doe Defendants I-X who failed to protect Mr. Kalatzakis, resulting in his death.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

*Failure to Protect from Harm and Provide Health Care in Violation of the Eighth and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. § 1983*

*(Against All Defendants)*

91. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 90 as

1  though fully set forth herein.

2        92.     Defendants had a duty to protect Mr. Kalatzakis from harm.

3        93.     Defendants failed to protect Mr. Kalatzakis from harm, despite his known

4  vulnerabilities including psychiatric and intellectual disabilities.

5        94.     Defendants Gipson and Grounds failed to ensure that Mr. Kalatzakis's

6  mental health needs were adequately assessed, identified, and treated, which resulted in his

7  inappropriate placement in general population cell with an inmate with a known history of

8  violence.

9        95.     Defendants Walker, Guglielmo, Romero, Sandor, Peterson, Tepperman,

10  Mascarenas, Bugarin, Watkins, and Oliveira failed to appropriately assess Mr. Kalatzakis's

11  housing classification status, which resulted in his assignment to an inappropriate cell

12  placement with Mr. Keen.

13        96.     Defendants Does I-X failed to appropriately assess Mr. Keen's housing

14  classification status and assigned him an inappropriate cell placement with Mr. Kalatzakis.

15        97.     In addition to the individual failures enumerated above, Defendants Grounds

16  Gipson, and Does I-X failed to adopt and implement adequate policies, procedures,

17  training, and supervision to ensure Mr. Kalatzakis's protection from harm. The policies,

18  procedures, and practices of Defendants, including their classification and housing

19  policies, procedures and practices; staffing policies, procedures, and practices; and training

20  and supervision policies, procedures and practices, were inadequate to protect Mr.

21  Kalatzakis from harm.

22        98.     Defendants' acts and/or omissions as alleged herein, including but not

23  limited to their failure to appropriately house Mr. Kalatzakis and Mr. Keen, along with the

24  acts and/or omissions of the Defendants in failing to adequately staff Facility C at SVSP,

25  failing to appropriately assess Mr. Kalatzakis's mental health needs and vulnerabilities,

26  and failing to appropriately assess Mr. Keen's dangerousness, constituted deliberate

27  indifference to Dimitris Kalatzakis's health and safety.

28        99.     Defendants failed to meet their constitutional obligation to protect Mr.

Kalatzakis from harm and demonstrated deliberate indifference to his safety through their policies, procedures, practices, actions, and/or omissions.

100.    As a direct and proximate result of Defendants' conduct, Dimitris Kalatzakis experienced physical pain, emotional distress, and mental anguish, as well as loss of his life and other damages alleged herein.

101.    The aforementioned acts of Defendants in their individual capacities were willful, wanton, malicious, and oppressive, thereby justifying an award to Plaintiffs of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

<u>SECOND CLAIM FOR RELIEF</u>

*Deprivation of Substantive Due Process Rights (Loss of Parent/Child Relationship) in Violation of First and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. § 1983*

*(Against All Defendants)*

102.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 101 as though fully set forth herein.

103.    The aforementioned acts and/or omissions of Defendants in being deliberatively indifferent to Dimitris Kalatzakis's health and safety, violating Mr. Kalatzakis's constitutional rights, and their failure to adopt and implement appropriate policies, procedures, and practices to prevent the acts and/or omissions that caused the untimely and wrongful death of Dimitris Kalatzakis deprived Plaintiffs D.K., Takis Kalatzakis, and Sandra Kalatzakis of their liberty interests in the parent-child relationship in violation of their substantive due process rights as defined by the First and Fourteenth Amendments to the United States Constitution.

104.    As a direct and proximate result of the aforementioned acts and/or omissions of Defendants, Plaintiffs suffered injuries and damages as alleged herein.

105.    The aforementioned acts and/or omissions of Defendants in their individual capacities were willful, wanton, malicious, and oppressive, thereby justifying an award of

exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

THIRD CLAIM FOR RELIEF

*Negligent Supervision, Training, Hiring, and Retention (Survival Action – California State Law)*

*(Against Defendants Gipson, Grounds, and Does I-X)*

106.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 105, as though fully set forth herein.

107.    Defendants Gipson, Grounds, and Does I-X had a duty to hire, supervise, train, and retain employees and/or agents so that employees and/or agents refrain from the conduct and/or omissions alleged herein.

108.    Defendants breached this duty, causing the conduct alleged herein. Such breach constituted negligent hiring, supervision, training, and retention under the laws of the State of California.

109.    As a direct and proximate result of Defendants' failure, Dimitris Kalatzakis and Plaintiffs suffered injuries and damages as alleged herein.

FOURTH CLAIM FOR RELIEF

*Negligence (Survival Action – California State Law)*

*(Against All Defendants)*

110.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 109, as though fully set forth herein.

111.    Defendants failed to comply with professional standards in the supervision and protection of inmates entrusted to their care by failing to adopt the minimum policies, procedures, and training necessary to ensure: adequate identification and assessment of vulnerabilities including psychological and intellectual disabilities; appropriate assessment of single and double cell status and housing classifications; and adequate staffing, supervision, and review, to adequately protect inmates in Facility C in SVSP from harm.

112.    Together, these Defendants acted negligently and improperly, breached their

COMPLAINT – JURY TRIAL DEMANDED

respective duties, and as a direct and proximate result, Plaintiffs suffered injuries and damages as alleged herein.

113.    The negligent conduct of Defendants was committed within the course and scope of their employment.

114.    The aforementioned acts of Defendants were conducted with conscious disregard for the safety of Dimitris Kalatzakis and others, and were therefore malicious, wanton, and oppressive. As a result, Defendants' actions justify an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

<u>FIFTH CLAIM FOR RELIEF</u>

*Wrongful Death – California Code Civ. Proc. § 377.60*

*(Against All Defendants)*

115.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 114, as though fully set forth herein.

116.    Dimitris Kalatzakis's death was a direct and proximate result of the aforementioned wrongful and/or negligent acts and/or omissions of Defendants. Defendants' acts and/or omissions thus were also a direct and proximate cause of Plaintiffs' injuries and damages, as alleged herein.

117.    As a direct and proximate result of Defendants' wrongful and/or negligent acts and/or omissions, Plaintiffs incurred expenses for funeral and burial expenses in an amount to be proved.

118.    As a direct and proximate result of Defendants' wrongful and/or negligent acts and/or omissions, Plaintiffs suffered the loss of the services, society, care, and protection of the decedent, as well as the loss of the present value of his future services to his mother and son.  Plaintiffs are further entitled to recover prejudgment interest.

119.    Plaintiff Estate of Dimitris Kalatzakis is entitled to recover punitive damages against individual Defendants who, with conscious disregard of Dimitris Kalatzakis's rights, failed to adhere to the legal mandates of prisoner supervision.

120.    The aforementioned acts of Defendants were willful, wanton, malicious, and oppressive, thereby justifying an award to Plaintiff of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request entry of judgment in their favor and against Defendants as follows:

1.    For compensatory, general and special damages against each Defendant, jointly and severally, in an amount to be proven at trial;

2.    For damages related to loss of familial relations as to Plaintiffs D.K., Takis Kalatzakis, and Sandra Kalatzakis;

3.    Funeral and burial expenses and incidental expenses not yet fully ascertained;

4.    General damages, including damages for physical and emotional pain, emotional distress, hardship, suffering, shock, worry, anxiety, sleeplessness, illness and trauma and suffering, the loss of the services, society, care and protection of the decedent, as well as the loss of financial support and contributions, loss of the present value of future services and contributions, and loss of economic security;

5.    Prejudgment interest;

6.    For punitive and exemplary damages against each individually named Defendant in an amount appropriate to punish Defendant(s) and deter others from engaging in similar misconduct;

7.    For costs of suit and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and as otherwise authorized by statute or law;

8.    For restitution as the court deems just and proper;

9.    For such other relief, including injunctive and/or declaratory relief, as the Court may deem proper.

//

//

1

**DEMARD FOR JURY**

2    Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand trial by jury.

3

4    DATED: December 26, 2014          Respectfully submitted,

5                                      RIFKIN LAW OFFICE

6

7                                      By:  */s/ Lori Rifkin*
8                                           Lori Rifkin

9                                      Attorney for Plaintiffs

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28